622 A.2d 727

**John Frederick THANOS**

v.

**STATE of Maryland.**

**No. 45, Sept. Term, 1992.**

Court of Appeals of Maryland.

April 5, 1993.

78

80

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender and Nancy M. Cohen, Asst. Public Defender, Baltimore), all on brief, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Ann N. Bosse, Asst. Atty. Gen., Baltimore), all on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This direct appeal in a capital murder case raises a number of issues surrounding the trial, sentencing proceeding, and death sentence imposed upon appellant John Frederick Thanos.

# I

On August 31, 1990, eighteen-year-old Gregory Allen Taylor, Jr. picked up Thanos, who was hitchhiking, in a rural area of Worcester County. Inside Taylor's car, Thanos removed a sawed-off rifle from his duffle bag and ordered Taylor to drive to a remote wooded area. When Taylor protested and begged for his freedom, Thanos shot Taylor three times in the head. Taylor died as a result of these wounds. Thanos then fled in Taylor's vehicle. Police apprehended Thanos in Delaware, where he admitted to various crimes including Taylor's murder. Thanos led detectives to Taylor's body, then confessed to the murder on videotape.

The State charged Thanos with several crimes, including murder in the first degree, and announced its intention to seek the death penalty. Thanos was tried in the Circuit

Court for St. Mary's County.[1] At the guilt-innocence phase of the trial, Thanos did not cross-examine any of the State's witnesses, nor did he offer any witnesses or evidence of his own. The court (Kaminetz, J.), sitting without a jury, found Thanos guilty of first degree premeditated murder, felony murder, robbery with a deadly weapon, robbery, use of a handgun in the commission of a crime of violence, and theft of property having a value over three hundred dollars.

At the subsequent sentencing proceeding before Judge Kaminetz, sitting without a jury, Thanos offered four witnesses in mitigation of his sentence: a psychiatric social worker, a psychiatrist, and a psychologist who were all familiar with Thanos's background and psychiatric history, and a corrections official who knew Thanos's history of institutional placements. The psychiatric witnesses established that Thanos came from an extremely dysfunctional family. They testified that Thanos's father had a history of mental illness and regularly abused his son both physically and emotionally. The elder Thanos also sexually abused his daughter, appellant's sister. In 1965, at age fifteen, Thanos was first incarcerated for auto theft in the Maryland Correctional Institution, where, according to the corrections official, other inmates seized on Thanos's small stature to abuse and sodomize him. Thanos was imprisoned three more times, for auto theft, rape, and robbery, between 1966 and 1990, spending almost all of those years in prison.

The medical witnesses testified that Thanos was diagnosed as schizophrenic at age seventeen, a diagnosis which later evolved into borderline personality disorder. They said that Thanos has self-destructive tendencies, gender identification disturbance, and that he most loses his ability to control his actions when under stress. The witnesses also testified Thanos attempted suicide numerous times while in prison.

---

1. The case originated in the Circuit Court for Worcester County but was removed to St. Mary's County pursuant to the Constitution of Maryland, Art. IV, § 8 and Maryland Rule 4–254(b)(1).

At the conclusion of the sentencing proceeding, the court weighed the aggravating and mitigating circumstances of Thanos's murder of Taylor in accordance with Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 413(h). By a preponderance of the evidence, the court found the mitigating circumstance delineated in § 413(g)(4) to apply, namely, that Thanos's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as result of mental incapacity, mental disorder or emotional disturbance." The court also recognized the following additional mitigating circumstances under § 413(g)(8): (1) the appellant is a product of a dysfunctional family; (2) early suggestions for mental health intervention for the appellant and his family were not followed; (3) the appellant was emotionally and physically abused as a child; (4) the appellant was inappropriately incarcerated in an adult correctional facility as a juvenile; and (5) the appellant was entitled to, and received, the mercy of the court.

On the other hand, the court found beyond a reasonable doubt that the aggravating circumstance in § 413(d)(10) also existed, namely, that Thanos "committed the murder while committing . . . a robbery. . . ." Finding this aggravating circumstance to outweigh the mitigating ones, the court sentenced appellant to death.[2]

Thanos appealed under the provisions of the Code, Art. 27, § 414(a) and Maryland Rule 8–306(c)(1). He asserts that the trial court committed reversible error for the following eight reasons: (1) the court failed to inquire into his competency to stand trial; (2) the court allowed him, as opposed to his counsel, to decide when he would allocute; (3) he did not

---

**2.** The court observed:
 What makes the defendant's action particularly egregious is that, to facilitate the commission of the robbery, the defendant used excessive, unnecessary, lethal force. . . . [H]e could have wounded or incapacitated his victim, who was already in a very desolate location. Instead, the defendant chose to murder the victim by shooting him three times, at close range, in the head.

knowingly and intelligently waive his right to testify; (4) he did not knowingly, intelligently, and voluntarily waive his right to be sentenced by a jury; (5) the court allowed him to waive his right to a jury trial, over his counsel's objection; (6) he did not knowingly, intelligently, and voluntarily waive his right to a trial by jury; (7) the court admitted improper expert opinion evidence; and (8) the court failed to grant relief for discovery violations. We shall address these assertions seriatim.

## II

■ Thanos argues first, and most strenuously, that the trial court erred in failing to inquire into his competency to stand trial. It is well established that criminal defendants in state courts have a Fourteenth Amendment due process right not to be tried while they are incompetent. As Chief Justice Burger explained for the Supreme Court:

It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.

*Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975), citing Blackstone's *Commentaries. See also Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Trimble v. State,* 321 Md. 248, 582 A.2d 794 (1990).

■ Pursuant to this constitutional rule, Maryland Code (1982, 1990 Repl.Vol., 1992 Cum.Supp.) § 12–103(a) of the Health–General Article specifies:

If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

The Code defines "incompetent to stand trial" as "not able: (1) to understand the nature or object of the proceeding; or

(2) to assist in one's defense." *Id.*, § 12–101(e). A defendant must, in other words, have "present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

■ As the statute makes plain, a trial court's duty to determine the competency of the accused is triggered in one of three ways: (1) upon motion of the accused; (2) upon motion of the defense counsel; or (3) upon a *sua sponte* determination by the court that the defendant may not be competent to stand trial. *See Johnson v. State*, 67 Md.App. 347, 507 A.2d 1134 (1986).

■ In the instant case, neither Thanos nor his counsel ever alleged that he was incompetent to stand trial. Nevertheless, Thanos argues that the trial court failed to recognize its *sua sponte* obligation to inquire into his competency given his strange behavior at trial and sentencing. Thanos points to several incidents which, he contends, should have suggested his incompetence to the trial court. First, he points out his unusual request to absent himself from the trial, when he claimed, "I know I will become disruptive and hurt my defense." Second, he notes his whimsical decisions to waive jury trial and sentencing, meanwhile changing his mind from his earlier decision to be absent from the proceedings. Third, he points to several strange remarks he made to the trial judge. (On one occasion, for example, he commented that "in dog years ... I would be like 200 and some years old." When sentenced to death, he asked, "Is that death by gas, or death by roo-roo?") Finally, and most importantly, Thanos notes his general history of mental illness, borderline personality disorder, and self-destructive tendencies. He contends that all of these things, taken together, should have alerted the trial court to his possible incompetence to stand trial.

Considering all the circumstances, we conclude that the trial court did not have a *sua sponte* obligation to conduct a competency hearing. We first note that prior to trial the State requested an opportunity to evaluate Thanos's competency to stand trial. Thanos opposed this request, stating

the State's petition must be dismissed because neither the Defendant nor his counsel has alleged the Defendant is incompetent and in the Defendants [sic] prior Court appearance, the Court did not indicate that the Defendant appeared incompetent. Therefore the Court would not have any authority to conduct a competency hearing at this time.

The court denied the State's request for a competency evaluation. Moreover, none of Thanos's three defense attorneys ever subsequently alleged that he was incompetent, despite their representation shortly after being retained that "[t]he Defendant now has counsel who can keep the Court appraised should a competency issue arise in the future."

As we see it, Thanos sought to have it both ways in this case, maintaining at first that he was not incompetent, thereby denying the State an opportunity to evaluate him; then, upon receiving a death sentence, maintaining that his bizarre behavior warranted a competency hearing. Our independent review of the record does not indicate that the trial court erred in failing to grant Thanos a competency hearing. None of Thanos's four expert witnesses at the sentencing proceeding ever suggested that he was incompetent to stand trial. While Thanos did make some peculiar remarks to the trial judge, his words on the whole were very lucid. He appeared to grasp all of his rights as they arose throughout the proceedings. He explained very clearly why he preferred conditions in the Super Max facility in Baltimore to those of the St. Mary's County Detention Center. And he understood and insightfully articulated his tendency to become disruptive under stress, which reasonably justified his initial desire to absent himself from the proceedings. As his counsel noted:

We believe the Court has adequate information and testimony from Mr. Thanos today to make a finding that his request [to excuse himself] is made freely and voluntarily without coercion. Defense counsel ... can attest to the fact that Mr. Thanos knows whereof he speaks. It is our experience that under the stress of a trial with people talking about his childhood, with people talking about his family situation that brings back strong memories ...[,] Mr. Thanos does *react to* ... these things ... detrimental[ly] to his defense.

Based on the foregoing, we think the record discloses that Thanos met the two-pronged test for competency to stand trial. He exhibited both "present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." *Dusky, supra,* 362 U.S. at 402, 80 S.Ct. at 789. All else aside, Thanos's thoughtful contemplation of how his own potentially disruptive presence would affect the deliberations of the factfinder indicates that he grasped not only the basic elements of the trial process but also its strategic dimensions. The trial court did not err in not conducting, *sua sponte,* a competency hearing.

## III

▉ Thanos next contends that the trial court committed reversible error in permitting him to allocute when he wished. Thanos's counsel had urged the court to have Thanos allocute at several points in the course of the sentencing proceeding. Counsel hoped to afford the psychiatric experts an opportunity to comment on Thanos's allocution as well as to allow the offensive remarks which counsel feared that Thanos would utter to be forgotten. Each time, however, the court deferred to Thanos's desire to speak at the end of the proceedings in order to "rebut things." True to his counsel's fears, after closing arguments, Thanos offered an inappropriate allocution in which he praised the physical features of various women in the courtroom.

Thanos cites our holding in *Parren v. State*, 309 Md. 260, 265, 523 A.2d 597 (1987), that "[w]hen a defendant is represented by counsel, it is counsel who is in charge of the defense and his say as to strategy and tactics is generally controlling...." The decision when to allocute, Thanos claims, is a tactical one, and therefore the trial court should have allowed his counsel to determine when he would allocute, as opposed to indulging Thanos's preference on the matter.

In *Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986), we traced the history of the right of allocution in Maryland. We recounted how the right of allocution has long been preserved at common law, and that the right has been recognized in the Maryland Rules since 1962, excluding a brief window between 1979 and 1984. Since July 1, 1984, allocution in capital cases has been governed by Rule 4–343(d), which provides: "Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement." [3]

As we observed in *Harris*,

the allocutory process provides a unique opportunity for the defendant himself to face the sentencing body, without subjecting himself to cross-examination, and to explain in his own words the circumstances of the crime and his feelings regarding his conduct, culpability, and sentencing. Indeed, even "the most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."

*Id.* at 358, 509 A.2d 120, quoting *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). *See also Shifflett v. State*, 315 Md. 382, 387, 554 A.2d 814 (1989) ("the raison d'etre of allocution as it exists in Maryland is to improve the truth-finding process by considering

---

**3.** Rule 4–342(e) controls the right of allocution in non-capital cases. It provides: "Before imposing sentence, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement and to present information in mitigation of punishment."

comments from the defendant's perspective"). We went on to hold in *Harris* that, while allocution "is not a fundamental right secured by either the federal or state constitution," *id.*, 306 Md. at 357, 509 A.2d 120, citing *Logan v. State*, 289 Md. 460, 425 A.2d 632 (1981), denial of the defendant's right to allocute will void the sentence and require a new sentencing proceeding. *Id.*, 306 Md. at 359, 509 A.2d 120.

Thanos now urges that allocution is sufficiently unimportant that defense counsel may dictate to his client when it will occur. We cannot agree. It is difficult to label allocution a "tactical" decision, appropriate for counsel to control, when our cases indicate that respect for allocution is an essential element of proper sentencing.

Moreover, in *Booth v. State*, 306 Md. 172, 507 A.2d 1098 (1986), vacated in part, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), we considered whether the prosecution could adversely comment on a defendant's allocution consistently with the Fifth Amendment's mandate that the government may not remark on a defendant's failure to testify. We held that it could, for though allocution is not exactly testimony, it "is more like testimony than silence and for Fifth Amendment purposes is testimonial, carrying with it, at a minimum, a waiver of any privilege to avoid comment by the prosecutor on the allocution." *Booth*, 306 Md. at 203, 507 A.2d 1098.

Since allocution, while not precisely testimonial, is testimonial for Fifth Amendment purposes and carries with it some of the burdens accruing to the testimonial privilege, we believe it must also carry the important benefit of that privilege—that it is the defendant, not counsel, who controls its exercise. *See Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (defendant controls decision to testify). As we observed in *Treece v. State*, 313 Md. 665, 547 A.2d 1054 (1988), "the defendant ordinarily has the ultimate decision when the issue at hand involves a choice that will inevitably have important personal consequences for him or her, and when the choice is one a competent

defendant is capable of making." *Id.* at 674, 547 A.2d 1054. The decision whether and when to allocute, like the decision whether and when to testify, is such a choice.

We note, finally, that while Thanos makes much of the fact that he frustrated his counsel's tactical objectives in allocuting when he did, he waited until the end of the proceedings for a good reason. We said in *Shifflett, supra,* 315 Md. 382, 554 A.2d 814, that

"[t]he very purpose of affording an accused the right to allocute before passing sentence is to provide him or her an opportunity to refute or explain any information presented to the sentencing judge and to present a statement in mitigation of punishment."

*Id.* at 386–87, 554 A.2d 814, quoting *Miller v. State,* 67 Md.App. 666, 674, 509 A.2d 135 (1986) Had Thanos responsibly rebutted or explained the damaging testimony preceding his allocution, he may have successfully mitigated his sentence. We will not now countenance defense counsel's effort to deny Thanos this precious opportunity for rebuttal merely because he failed effectively to seize it. The trial court did not err in allowing Thanos to decide when he would allocute.

### IV

Thanos next contends that he did not knowingly and intelligently waive his right to testify at the guilt-innocence proceeding. In informing Thanos of his right to testify at the close of the State's direct evidence, Thanos's counsel stated:

Do you understand if you elect to testify you would be subject to cross examination by the State's Attorney and the State's Attorney could inquire into *any* prior convictions that you may have? (emphasis added)

Thanos points out that this advice was incorrect, for he had several prior convictions which, for various reasons, were not admissible for impeachment purposes. Because he relied on incorrect advice from counsel, Thanos asserts that he did not knowingly and intelligently waive his right to

testify, thus requiring that we reverse his murder conviction. Our cases suggest otherwise.

■ In *Gilliam v. State*, 320 Md. 637, 579 A.2d 744 (1990), we reaffirmed a long-standing rule that criminal defendants represented by counsel are presumed to have been informed of their constitutional rights, including the right to testify. *Id.* at 652, 579 A.2d 744, citing *Stevens v. State*, 232 Md. 33, 192 A.2d 73 (1963). Thus, trial judges have no affirmative duty to inform represented defendants of their right to testify except "where it becomes clear to the trial court that the defendant does not understand the significance of his election not to testify or the inferences to be drawn therefrom...." *Gilliam*, 320 Md. at 652–53, 579 A.2d 744. We held further that an ambiguity in an on-the-record colloquy between the defendant and his counsel concerning the right to testify will not necessarily undermine a knowing and intelligent waiver of that right:

> Where there is no indication that the defendant has a misperception of his right to remain silent and the effect of exercising that right, and where he expressly indicates he has been fully advised of and understands the right, as well as the effect of a waiver, then an ambiguous statement made by defense counsel during an "on the record" explanation does not result in reversible error if the trial court fails to intervene and clarify counsel's ambiguous statement.

*Id.*, 320 Md. at 656, 579 A.2d 744. Very recently, we reaffirmed our holding in *Gilliam* and even extended it to situations in which the trial court, as opposed to defense counsel, makes an ambiguous statement to the defendant regarding the right to testify. *See Oken v. State*, 327 Md. 628, 639, 612 A.2d 258 (1992).

*Gilliam* controls the instant case. The record gives no hint that counsel's questionable advice influenced Thanos's decision not to testify. Before the trial began, Thanos stated on the record that he had no intention to testify. He confirmed to the court at that point that he had discussed with counsel his right to testify and his desire to forego

that right. Defense counsel subsequently indicated no fewer than three times that the defense would present no evidence. It was only at the conclusion of the State's case that defense counsel made the ambiguous statement about prior convictions to Thanos in explaining his right to testify; but nothing in Thanos's responses suggests that counsel's statement caused him to change his mind about testifying, for the record clearly reflects that he had already decided not to do so.

Thanos relies on *Morales v. State*, 325 Md. 330, 600 A.2d 851 (1992); there, the trial court ambiguously suggested to the defendant that the prosecution could use his prior convictions to impeach him if he testified, when in fact, as in the instant case, the State for various reasons could not use those convictions. The defendant declined to testify and was convicted; we held the judge's mistake to be reversible error. Two crucial distinctions, however, differentiate that case from this one. First, Morales was unrepresented. He relied on the trial judge for instruction about his right to testify, and we held that while the court need not have elaborated as to the danger of impeachment, once it undertook to do so, it was obligated to do so correctly. Second, the record suggested very strongly that the court's mistake materially affected Morales's decision not to testify. Indeed, Morales had stated that he wanted to take the stand until the trial judge erroneously warned him of the impeachment hazards presented by his prior convictions.

Here, Thanos was represented by competent counsel whose ambiguous statement as to prior convictions did not affect Thanos's choice not to testify. Under our decision in *Gilliam*, the trial court did not err in failing to intervene and correct counsel's statement.

V

Thanos's next three claims stem from his waiver of his right to be tried and sentenced by a jury. Thanos first claims that the court erred in permitting him to waive, over

his counsel's objection, his right to be tried before a jury. Thanos points to our observation in *Treece, supra,* that the decision whether to waive trial by jury is ordinarily reserved to the defendant as opposed to his counsel, assuming the choice "is one a competent defendant is capable of making." *Id.,* 313 Md. at 674, 547 A.2d 1054. Thanos asserts that given the extensive psychiatric testimony as to his mental illness, he was not competent to make the decision to waive trial by jury, and consequently the court should have deferred to his counsel's preference for a jury trial.

Second, Thanos posits that even if the choice to waive a jury trial were his to make, he did not knowingly, intelligently, and voluntarily do so. He points to his unusual responses to the trial judge as the court explained his right to trial by jury. For example, one reason he gave for preferring a court trial was to expedite his return to the Super Max prison in Baltimore, which he preferred to the St. Mary's County Detention Center. Thanos cites the triviality of this reason, against the background of his mental illness, as evidence that he did not knowingly waive his right to trial by jury.

Third, Thanos asserts that he did not knowingly, intelligently, and voluntarily waive his right to be sentenced by a jury. He again points to various bizarre exchanges he had with the trial judge as the court delineated the sentencing procedure to him. In one, when the court explained that a defendant's youthful age could be considered as a mitigating factor, Thanos pointed out that "in dog years ... I would be something like 200 and some years old." In another, the judge informed Thanos that the court, sitting as the fact-finder, would have to make written findings. Thanos asked whether the judge could have his secretary do it, but the judge responded, "It has to be me." Thanos commented, "Man, that sucks." Thanos points to these two colloquies as evidence that he could not have knowingly, intelligently, and voluntarily waived his right to be sentenced by a jury.

We find no merit in these contentions. Thanos has made no claim that the trial court erred in explaining his right to be tried and sentenced by a jury. In both cases, the trial judge patiently spelled out to Thanos the alternatives and consequences involved in proceeding before a judge rather than a jury. As we noted in *Treece*, a decision need not be wise to be legally "intelligent." 313 Md. at 683, 547 A.2d 1054. All that matters is that Thanos was "made aware of available alternatives and of the advantages and disadvantages of one choice as compared to another." *Id.* Because Thanos was so informed, his arguments that he did not knowingly waive trial and sentencing by jury, and that the court should have deferred to his counsel's position on the issue of jury trial waiver, are merely extensions of his claim that he was incompetent to stand trial, which is devoid of merit for the reasons discussed in part II, *supra.*

## VI

Thanos next alleges that the trial court improperly admitted expert testimony from a State psychologist, Dr. Lawrence Raifman, who testified for the State that

> [a]nti-social Personality Disorder is given a connotation in mental health circles, in a forensic hospital as criminal, as though a person is a criminal. Repeated criminal conduct, a criminal offender.
>
> ... [I]t's very important for the Court to consider that efforts to minimize, perhaps run away from a diagnosis of Anti-social Personality Disorder by experts reflects an understanding that this disorder is synonymous with criminal behavior, and shouldn't be given a shelter of a mental disorder connotation within the context that we speak.

Raifman's remarks were not properly the subject of expert testimony, Thanos argues, because they invaded the province of the court by suggesting that the court should accord little weight to Thanos's psychiatric diagnosis. Thanos also contends that Raifman's comments were not within his qualifications as an expert.

We recently reiterated that " 'the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Oken, supra,* 327 Md. at 659, 612 A.2d 258, quoting *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903 (1984). The instant case does not present the rare situation in which improperly admitted expert testimony requires reversal.

■■■ As to Thanos's first claim that Raifman's comments were not a proper subject of expert testimony, Thanos edits the doctor's remarks from their relevant context. The record reveals that Raifman was attempting to explain the relationship between terms used in the Diagnostic and Statistical Manual of psychiatric disorders and those same terms as used in the legal system. As part of his explanation, Raifman used the words quoted above to illuminate how the diagnosis of Anti-social Personality Disorder is perceived in the psychiatric community. To be relevant, expert testimony need only provide the fact-finder with "appreciable help ... in resolving the issues presented in the case." *Simmons v. State,* 313 Md. 33, 41, 542 A.2d 1258 (1988). Here, we believe Raifman's testimony as to how the psychiatric profession views the diagnosis of Anti-social Personality Disorder may have appreciably assisted the court in evaluating Thanos's criminal actions.

■■■ Thanos's claim that Raifman was unqualified to offer the remarks in question is also without merit. To qualify as an expert, one need only "possess 'such skill, knowledge, or experience in that field or calling as to make it appear that [the] opinion or inference will probably aid the trier [of fact] in his search for truth.' " *Radman v. Harold,* 279 Md. 167, 171, n. 2, 367 A.2d 472 (1977), quoting *Consol. Mech. Contractors v. Ball,* 263 Md. 328, 338, 283 A.2d 154 (1971). Raifman had degrees in both psychology and law. Although he was only offered as an expert in psychology, he had both practiced and taught law. Not only would his status as both a lawyer and a psychologist

make it appear that he would aid the court in its quest for truth, it is difficult to imagine a combination of qualifications that would better equip a person to explain and to compare and contrast the differing legal and psychological connotations of certain terms.

The trial court did not abuse its discretion in admitting Raifman's testimony.

## VII

In his final assignment of error, Thanos claims that the trial court failed to grant him relief for discovery violations by the State. Specifically, Thanos asserts that the State neglected to provide him with the names of three witnesses whom it called at trial, in violation of Maryland Rule 4–263(b)(1).[4] The three witnesses were Lois Dennis, the victim's mother, who identified photographs of her son and his car and who testified concerning her last encounter with her son; Edward Mason, who was with Thanos subsequent to the murder and who testified that Thanos had been carrying the murder weapon and had made statements about killing a boy; and Richard McGlaughlin, who testified to selling Thanos the murder weapon. Thanos alleges that he was prejudicially surprised by these witnesses, and that therefore the court erred in denying him appropriate relief.

We will assume, without deciding, that the State indeed violated Rule 4–263(b)(1) in presenting several witnesses, and we will also assume, without deciding, that these witnesses in fact surprised Thanos. We must still reject Thanos's contention, for we are "able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict...." *Dorsey v. State,* 276 Md. 638, 659,

---

4. This Rule provides:
 Upon request of the defendant, the State's Attorney shall:
 (1) Witnesses.—Disclose to the defense the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony.

350 A.2d 665 (1976). That any error in the State's discovery violations was harmless is beyond question, given the fact that Thanos confessed to murdering Gregory Taylor.

 Of course, an extrajudicial confession to a crime must always be corroborated by other evidence. *Woods v. State*, 315 Md. 591, 556 A.2d 236 (1989). However, in *Woods* we reaffirmed an earlier holding that

"[i]n a homicide case the proof [necessary to corroborate a confession] is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone."

*Id.*, 315 Md. at 617, 556 A.2d 236, quoting *Jones v. State*, 188 Md. 263, 272, 52 A.2d 484 (1947). In the instant case, the stipulated testimony of one Dr. Peretti, an Assistant Medical Examiner for the State, independently corroborated Thanos's confession by providing that Gregory Taylor was indeed dead, the victim of three gunshot wounds to the side of the head. Thus, any error emanating from the testimony of the three disputed State witnesses was completely harmless. As Thanos's counsel admitted to the court, "Guilt or innocence is a foregone conclusion in this case as far as first degree murder, Your Honor, we are not disputing that." The trial court's failure to grant relief for the State's discovery violations was not reversible error.

## IX

Finally, although Thanos does not specifically raise the issue, we consider the trial court's imposition of the death sentence under the Code, Art. 27, § 414(e). That section requires us to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the ... court's finding of a statutory aggravating circumstance under § 413(d);

98

(3) Whether the evidence supports the ... court's finding that the aggravating circumstances outweigh the mitigating circumstances.[5]

 We are satisfied, first, that the trial court did not impose the sentence of death under the influence of passion, prejudice, or any other arbitrary factor. Though the murder occurred in Worcester County, the trial and sentencing were removed across the Chesapeake Bay to St. Mary's County. The record reflects that the court fairly and patiently explained to Thanos his rights throughout the proceedings, and then dispassionately determined that a sentence of death was appropriate.

 The evidence also supports the trial court's finding of the statutory aggravating circumstance in § 413(d)(10), that the "defendant committed the murder while committing ... a robbery ... in the first degree." The record clearly establishes that Thanos murdered Gregory Taylor while in the process of stealing his vehicle.

 Finally, the evidence supports the trial court's finding that the aggravating circumstance outweighed the mitigating circumstances. The record supports the court's finding that the cruel, callous, and excessively forceful death which Thanos inflicted upon Gregory Taylor outweighed the mitigating aspects of Thanos's tragic background.

For these reasons, the trial court's imposition of the death penalty was appropriate under the law.

JUDGMENT AFFIRMED.

---

5. Chapter 331 of the Acts of 1992, effective October 1, 1992, deleted subsection (e)(4) of § 414. Thus, we no longer need to determine "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."