625 A.2d 932

**John Frederick THANOS**

**v.**

**STATE of Maryland.**

**No. 66, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 7, 1993.

Nancy Forster, and Michael Braudes, Asst. Public Defenders (Stephen E. Harris, Public Defender, all on brief), Baltimore, for appellant.

Gwynn X. Kinsey, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Anne N. Bosse, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case is the second of two direct appeals by appellant, John Frederick Thanos, who was twice convicted of capital murder and twice sentenced to die.

## I

On September 2, 1990, Thanos entered the "minimart" of a Big Red gasoline station in Essex, Maryland. There, he persuaded the station employees, sixteen-year-old Billy Winebrenner and fourteen-year-old Melody Pistorio, to accept his gold watch in exchange for ten dollars worth of gasoline and twenty dollars in cash. The following day, Thanos returned to the gas station intent on robbing and killing the teenagers. He did so, demanding cash from the youths with a sawed-off rifle, then shooting Billy once in the back of the head and Melody twice in the head.

Three days earlier, Thanos had murdered eighteen-year-old Gregory Taylor with the same sawed-off rifle, after the young man had picked up Thanos, who was hitchhiking in a rural area of Worcester County. Thanos murdered Taylor with three shots to the head, then fled in Taylor's vehicle. After killing Billy and Melody in Baltimore County, Thanos

drove to Delaware, where he was later apprehended by the police. Thanos confessed to all three murders on videotape.

In March of 1992, Thanos was tried for Taylor's murder in the Circuit Court for St. Mary's County. He was convicted, sentenced to death, and appealed. We affirmed both the conviction and the death sentence. *Thanos v. State*, 330 Md. 77, 622 A.2d 727 (1993) (*Thanos I*).

In January of 1992, Thanos was tried for the slayings of Billy and Melody in the Circuit Court for Garrett County.[1] At the guilt-innocence phase of the trial, Thanos conceded his role in the killings; he cross-examined none of the State's witnesses and presented no witnesses or evidence of his own. The jury convicted Thanos of two counts of first degree murder (both premeditated and felony), two counts of robbery with a deadly weapon, and one count of use of a handgun in the commission of a felony.

Shortly thereafter, sentencing began before a jury. Thanos put on substantially the same case in mitigation of his sentence as he had done in the St. Mary's County proceeding, which we fully delineated in *Thanos I*, 330 Md. at 82, 622 A.2d 727. In sum, Thanos offered, as witnesses in his behalf, a psychiatric social worker, a corrections official, a psychiatrist, and a psychologist. The social worker and corrections official testified that Thanos came from an extremely dysfunctional and abusive family and had an unfortunate history of institutional placements in which he was further abused. Following these witnesses, Thanos allocuted, offering an incoherent but innocuous diatribe focusing on legal and religious themes.

The medical witnesses then testified that Thanos suffered from a borderline personality disorder and generally lost his ability to distinguish fantasy from reality when under stress. The two doctors also opined that Thanos satisfied the statutory mitigating factor in Maryland Code (1957,

---

1. The case originated in the Circuit Court for Baltimore County but was removed to Garrett County.

1992 Repl.Vol.), Art. 27, § 413(g)(4), namely, that the murders were committed "while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance."

The State called one witness in rebuttal, Dr. Michael Spodak. Spodak opined that Thanos was not substantially impaired by his mental illness, that he committed the murders purposefully and was cognizant of their ramifications. On cross-examination, Thanos's counsel asked Spodak what records he had reviewed in preparing his testimony. Spodak answered that, among others, he had reviewed records dating from Thanos's involuntary commitment to the Clifton T. Perkins hospital in 1990. In February of 1991, the Circuit Court for Baltimore County (Levitz, J.) had ruled that *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), precluded the State from using any statements Thanos uttered in response to questioning during his Perkins commitment. The court's ruling had left open the possibility, however, that the State could use the Perkins records generally, as well as any statements Thanos blurted out voluntarily.

When Spodak admitted he had reviewed the Perkins records, Thanos's counsel requested a recess to examine the records, whereupon the court adjourned for lunch. When the proceedings resumed, Spodak acknowledged that he had received the Perkins records from the State's Attorney's office. At this point, Thanos's counsel requested a bench conference and moved for a mistrial, arguing that Spodak had tainted the jury with testimony derived from Perkins statements used in violation of Judge Levitz's order. The court (Thayer, J.), out of the presence of the jury and the witness, heard argument by the parties on the motion. It then recalled Spodak without reconvening the jury. Spodak testified that he only used the Perkins records for the opinions of the examining doctors and did not look at Thanos's statements. Spodak subsequently admitted, how-

ever, that during the luncheon recess he had overheard the State's Attorney comment "that there was some ruling or something about not mentioning the statements that were in the records." The court promptly granted Thanos's motion for a mistrial.

In May, 1992, the court conducted a hearing in preparation for a new sentencing proceeding, at which Thanos elected to be sentenced by the court instead of a jury. The second sentencing proceeding occurred the following month. Thanos's case in mitigation was identical to his case in the aborted first proceeding, except that the psychiatric social worker could not appear and Thanos called an additional corrections official. In rebuttal, the State called Dr. Neil Blumberg, who opined that Thanos was not substantially impaired in appreciating the criminality of his conduct or in conforming it to the law. Blumberg suggested that, in killing Billy and Melody, Thanos may have rationally desired to steal money and eliminate witnesses to the crime. After all the witnesses had testified, Thanos allocuted. Unlike in the first proceeding, Thanos's allocution was repugnant and excessively provocative; in essence, he explained how he wished he could put Billy and Melody and their families through even more anguish.

After closing arguments, the court weighed the aggravating and mitigating circumstances of the murders in accordance with Code, Art. 27, § 413(h). It found the aggravating circumstances in §§ 413(d)(9) and (10) to exist in each case, namely, that Thanos "committed more than one offense of murder in the first degree arising out of the same incident" and that he "committed the murder[s] while committing ... a robbery." As a mitigating circumstance in both murders, the court found under § 413(g)(8) that Thanos's ability to conform his conduct to the requirements of law was impaired, even though it was not "substantially" impaired under § 413(g)(4). Finding the aggravating circumstances to outweigh the mitigating one, the court imposed the death penalty for both homicides.

Thanos appealed under Code, Art. 27, § 414(a) and Maryland Rule 8–306(c)(1). He contends the trial court erred for six reasons, four of which ring familiar from *Thanos I:* (1) the court failed to inquire, *sua sponte,* into his competency to stand trial and sentencing; (2) double jeopardy principles precluded the court from allowing a second sentencing proceeding; (3) he did not knowingly and intelligently waive his right to testify at trial; (4) he did not knowingly and intelligently waive his right to be sentenced by a jury; (5) the court allowed him, as opposed to his counsel, to decide when he would allocute; and (6) the court improperly admitted and excluded several prospective jurors.

We consider these contentions in order.

## II

■ Thanos's main contention, as in his first appeal, is that the trial court improperly failed to conduct a hearing to determine his competency to stand trial and sentencing. Thanos points to his obnoxious comments and angry outbursts throughout the proceedings as evidence of his incompetence. He notes, for example, his disrespect for the court (he challenged the trial judge, whom he called "Your Excellency," to bind and gag him); his animosity for the State's Attorney (he frequently called her "evil" among other names); and his liberal interjection of profanity into the proceedings. Recalling his experts' testimony that he becomes irrational under stress, Thanos claims he was particularly incompetent at the second sentencing proceeding in light of the death sentence he had earlier received in St. Mary's County. And Thanos points to his mental illness, a borderline personality disorder, as the foundation of his incompetence. He asserts that, collectively, these factors should have awakened the trial court to its *sua sponte* obligation to inquire into his competency to stand trial.

■ As we said in *Thanos I,* criminal defendants have a constitutional right not to be tried while they are incompetent. 330 Md. at 84, 622 A.2d 727. *See Drope v. Missouri,*

420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Thus, Maryland Code (1982, 1990 Repl.Vol., 1992 Cum. Supp.), § 12–103(a) of the Health–General Article requires:

> If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

The Code defines "incompetent to stand trial" as "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." *Id.*, § 12–101(e). A defendant must, in other words, have "present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). *See Thanos I*, 330 Md. at 85, 622 A.2d 727.

In the instant case, as in his first appeal, Thanos never alleged to the court that he was incompetent to stand trial. Nor did any of his expert witnesses ever so claim, including the psychiatrist and the psychologist who together interviewed Thanos no fewer than nine times in 1991 and 1992. Nor did any of Thanos's three defense lawyers ever allege his incompetency, despite their presence throughout the trial and sentencing when Thanos was supposedly acting so strangely. Indeed, in the St. Mary's County proceedings, Thanos's counsel had even opposed the State's request for a competency hearing and promised to keep the court apprised of any future competency issue. Notwithstanding this collective inaction, Thanos now insists the trial court had a *sua sponte* obligation to inquire into that which his doctors, his lawyers, and he himself saw no need to explore.

 We believe the trial court had no such obligation. A lawyer's failure to allege a client's incompetency will not relieve a court of its duty to conduct a competency hearing *sua sponte* if the circumstances so warrant. *Pate, supra,*

383 U.S. at 384, 86 S.Ct. at 841; *Thanos I,* 330 Md. at 84–85, 622 A.2d 727; Code (1982, 1990 Repl.Vol.), § 12–103(a) of the Health–General Article. However, "judges must depend to some extent on counsel to bring issues into focus." *Drope, supra,* 420 U.S. at 176–77, 95 S.Ct. at 906. A lawyer who has been acquainted with a client for months will be much more familiar with the client's mental state than a judge who has just met the defendant at trial. *See Medina v. California,* —— U.S. ——, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ("[D]efense counsel will often have the best-informed view of the defendant's ability to participate in his defense."). The failure of Thanos's three counsel to move for a competency hearing, though not dispositive, undermines his post-hoc bid for such an inquiry.

■ Counsel's inaction notwithstanding, our independent review of the record indicates that the trial court did not err in failing to grant Thanos a competency hearing. As explained earlier, to be legally competent a defendant need only be able to understand the proceedings against him and to consult rationally with his lawyer. Thanos clearly understood the proceedings against him. As opposed to offering blank stares or gibberish from the trial table, Thanos's remarks reveal that he was very interactive with the court. At one point during the presentence hearing he astutely observed:

> Okay. There's no question to the guilt in the case. We've been through that phase of it. The video speaks for itself. I don't think there's anything that any—I would be going over the same identical presentations that they made before all the way up to the very end where there was a mistrial at the very last witness. So there would be essentially nothing new, and the only thing I could do with my presence is damage my case further, if they could do anything to assist me.

Thanos cites the angry and offensive character of most of his comments as evidence of the stress he was feeling, which rendered him incompetent. But this type of behavior

does not mean that he was incompetent to stand trial. Rather, it indicates that he comprehended the situation enough to feel stress. The law only requires that a defendant understand the proceedings, not be at peace with them.

Thanos also had a reasonable ability to consult rationally with his counsel. His attorneys informed the court that they had consulted extensively with Thanos on a number of issues. His expert psychologist testified that Thanos "can plan and think," suggesting he was able to assist his counsel in formulating his defense. Thanos himself exclaimed at one point that he and his counsel "just don't see eye-to-eye on anything," indicating that Thanos could critically evaluate his counsel's tactics. Most tellingly, Thanos's counsel conceded that Thanos was "not ... incapable of assisting his defense." The law requires no more.

Because Thanos understood the nature of the proceedings against him and was reasonably able to consult with his counsel, the trial court did not err in failing to order a competency hearing *sua sponte*.

## III

■ Thanos next contends that principles of double jeopardy barred his second sentencing proceeding, at which he received the death penalty. Specifically, Thanos claims that, by giving Dr. Spodak the records of his 1990 Perkins commitment, the State's Attorney deliberately sought to provoke a mistrial in the first sentencing proceeding, which precluded a second proceeding under current tenets of double jeopardy law. Thanos is mistaken.

■ The Double Jeopardy Clause of the Fifth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), protects defendants from repeated prosecutions for the same crime. *United States v. Dinitz*, 424 U.S. 600, 607–10, 96 S.Ct. 1075, 1079–81, 47 L.Ed.2d 267 (1976). Ordinarily, of course, when a defendant requests a mistrial, he waives

his "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *see United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978).[2]

In *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), however, the Supreme Court clarified a single exception to this rule:

> [W]here the government['s] conduct ... is intended to "goad" the defendant into moving for a mistrial ... a defendant [may] raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Id.,* 456 U.S. at 676, 102 S.Ct. at 2089. The idea behind this exception is that the government should not be able to orchestrate a second chance for a conviction if it determines that acquittal is likely in the first trial. The Court in *Kennedy* emphasized, however, that the prosecution must *intend* to coax a mistrial for double jeopardy to bar further proceedings. Conduct amounting to simple "harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion," *id.,* 456 U.S. at 675–76, 102 S.Ct. at 2089, is not enough.

Our cases are in exact accord with *Kennedy.* Even before *Kennedy,* we said through Judge Orth that double jeopardy does not bar retrial after a defense-requested mistrial unless

> error or misconduct ... was committed by either the prosecution or the court with the intention of (1) forcing the defendant to move for or consent to a mistrial, or (2) prejudicing his prospects for an acquittal if the trial continued to a verdict. It is "bad faith conduct by judge or prosecutor" with such intent that prohibits retrials. [Footnote omitted.]

---

**2.** While the Supreme Court usually discusses the effect of the Double Jeopardy Clause on further "trials," the same principles apply to second sentencing proceedings as well. *Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270 (1981).

The keystone of the test formulated and consistently followed by the Supreme Court is the requirement of "intent." And intent is implicit in "bad faith."

*Bell v. State,* 286 Md. 193, 204–05, 406 A.2d 909 (1979). *See also Booth v. State,* 301 Md. 1, 4–6, 481 A.2d 505 (1984).

More recently, we observed:

Ordinarily when the defendant seeks or consents to a mistrial, double jeopardy imposes no bar to a retrial. But if the prosecution has intentionally goaded the defendant into requesting a mistrial, or deliberately and improperly tried to harm the defendant's prospects for acquittal, a defense-sought mistrial may raise the bar of double jeopardy.

*Harris v. State,* 312 Md. 225, 240, n. 7, 539 A.2d 637 (1988).[3]

These principles dictate that Thanos's double jeopardy claim is misplaced, for at least three reasons. First, Thanos claims the State's Attorney attempted to force a mistrial by giving the Perkins documents to Dr. Spodak in violation of Judge Levitz's order.[4] As just discussed, the gravamen of

---

**3.** At oral argument, Thanos seized upon some of the quoted language from *Harris* as indicating that we intended to go further than the Supreme Court in *Kennedy* in barring certain retrials after defense-requested mistrials. Specifically, Thanos suggests that the phrase in *Harris* "or deliberately and improperly tried to harm the defendant's prospects for acquittal" provides an alternative ground for raising the double jeopardy bar besides the intentional prosecutorial goading of a mistrial.

This is incorrect, because the language in question merely reiterates the *Kennedy* standard. When the prosecution acts to goad a mistrial, then necessarily it "deliberately and improperly trie[s] to harm the defendant's prospects for acquittal." The converse is also true, because a prosecutor who deliberately uses improper tactics against a defendant knows that, if detected, the defendant will urge a mistrial. No matter how expressed, the standards are one and the same.

**4.** Thanos also claims, tangentially, that the State's Attorney intended to cause a mistrial by improperly discussing Judge Levitz's ruling with Dr. Spodak during the luncheon recess. However, contrary to Thanos's assertion, the court had not ordered Spodak to be sequestered during lunch. Moreover, the court explicitly stated that it declared the mistrial not because of any discussion between Spodak and the State's Attorney, but because Spodak may have tainted the jury with

any assertion that double jeopardy bars further prosecution following a defense-requested mistrial is prosecutorial intent to abort the first trial. In this case, the trial judge explicitly found on the record that the State's Attorney did not intend to abort the first sentencing proceeding. We afford great deference to that finding.

Second, the State's Attorney presumably gave Spodak the Perkins documents well in advance of the first sentencing proceeding, in order that he might prepare his testimony. But we have reasoned that

> [l]ogically, it would seem that prosecutorial conduct occurring pretrial could rarely form the basis for applying the exception to the general rule since the prosecutor would hardly intend to abort a trial before it has even started.

*Booth, supra,* 301 Md. at 7, 481 A.2d 505.

Third, we do not read Judge Levitz's order to preclude the State's Attorney's action. In ruling on the defendant's motion to bar the Perkins documents under *Estelle v. Smith,* Judge Levitz stated:

> It seems to me the only way to resolve this and the way that's the safest, and that is that it protects the defendant's interests, is for the State to make no use of any part of the record that contains statements of the defendant. That's the simplest way to do it and the way that makes sense.
>
> All I am saying is the statements made by the defendant to the doctors there in regard to this hearing that he was involuntarily committed, are not to be used by the State period.
>
> In regard to any questioning, yes; that is, the State may not use it. Any statements that he made in response to questions....

---

testimony derived from statements used in violation of Judge Levitz's ruling.

He walks in the door and starts screaming, "Hey, I did whatever." That can be used, but if they questioned him, the State can't use it.

At the conclusion of the hearing, Judge Levitz wrote by hand on the defendant's motion: "Granted in part, denied in part. State not to use statements of defendant as a result of questioning."

While Judge Levitz clearly ruled that the State's Attorney could not use statements that Thanos had uttered under interrogation, his ruling indicates that the State could use statements which Thanos blurted out of his own accord. Thus, the State's Attorney's action in giving the Perkins documents to Spodak was not improper *per se*, for the documents had some legitimate use. The State's Attorney's action, then, could not have been designed to force a mistrial.

For all of these reasons, principles of double jeopardy did not preclude Thanos's second sentencing proceeding.[5]

---

5. Thanos also cursorily asserts that his second sentencing proceeding was barred by Code, Art. 27, § 413(b), which provides:

Th[e sentencing] proceeding shall be conducted:
(1) Before the jury that determined the defendant's guilt; or
(2) Before a jury impaneled for the purpose of the proceeding if:
 (i) The defendant was convicted upon a plea of guilty;
 (ii) The defendant was convicted after a trial before the court sitting without a jury;
 (iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or
 (iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or
(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant.

Thanos argues that § 413(b)(2)(iii) barred his second sentencing proceeding because the trial court did not dismiss the jury that determined his guilt for good cause; rather, the prosecutor's improper conduct forced the court to declare a mistrial.

This claim is baseless. It is evident that § 413(b) simply specifies the alternative fact-finders before whom a sentencing proceeding may be conducted and provides no ground for barring a second sentencing proceeding. Moreover, Thanos misperceives the "good cause" language of § 413(b)(2)(iii) as extending to prosecutorial conduct, when

## IV

 Thanos's next three assertions mirror three more of his claims from *Thanos I*. First, Thanos argues that he did not knowingly and intelligently waive his right to testify at trial. This he blames on the fact that his counsel informed him that if he testified, he "would be subject to cross-examination by the State's Attorney and that some of your prior convictions, if any, might be inquired into." Because some of his more serious convictions were in fact inadmissible for impeachment purposes, Thanos claims that his lawyer's advice confused him into remaining silent. Thanos made exactly the same claim in *Thanos I*. We rejected it, even though counsel's advice informed Thanos that "any," as opposed to "some," of his prior convictions might be used to impeach him. *Thanos I*, 330 Md. at 90–92, 622 A.2d 727. For the reasons stated in *Thanos I*, we again reject Thanos's claim that he did not knowingly waive his right to testify.

Second, Thanos says he did not knowingly and intelligently waive his right to be sentenced by a jury. As in *Thanos I*, Thanos does not contend that the trial court erred in explaining his right to a jury sentencing; he simply points to his hostile and disruptive comments throughout the proceedings as evidence that he unintelligently elected to be sentenced by the court. As in *Thanos I*, we reject this claim because it merely restates Thanos's more general assertion that he was incompetent to stand trial, which is without merit for the reasons stated in part II, *supra*. *See Thanos I*, 330 Md. at 93–94, 622 A.2d 727.

Third, Thanos contends that the trial court improperly allowed him, as opposed to his counsel, to decide when he would allocute. He cites *Parren v. State*, 309 Md. 260, 265, 523 A.2d 597 (1987), for the proposition that counsel, not the client, controls the tactical decisions at trial, and he urges

---

in fact it applies only to the trial court's decision to dismiss a jury. The granting of a mistrial—for whatever reason—constitutes "good cause" for dismissing a jury.

that the timing of allocution is one such decision. Thanos claims that in opting to allocute at the end of his case in mitigation, he frustrated his counsel's plan to have him allocute earlier so that the medical experts could analyze and defuse his allocution. Again, Thanos made precisely the same claim in *Thanos I.* We reject it now, as then, for the reasons there stated. *Thanos I,* 330 Md. at 87–90, 622 A.2d 727.

## V

■■■ Thanos's final contention is that the trial court erred during *voir dire* proceedings by improperly preventing him from excluding three unfavorable prospective jurors while itself removing one potentially favorable juror. Thanos complains that the three unfavorable jurors each expressed views indicating an inability to appropriately consider the sentence of life imprisonment, as opposed to the death penalty. He claims that the favorable juror, despite voicing serious reservations to the court about the death penalty, could have demonstrated an ability to fairly consider the alternative sentences had he had the chance to rehabilitate her.

We need not examine the substance of any of these claims, for any error the trial court committed was utterly harmless. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) (an error is harmless where the court can "declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict"); *Thanos I,* 330 Md. at 96, 622 A.2d 727. As explained earlier, the trial court declared a mistrial in the first sentencing proceeding, and the second sentencing proceeding was conducted without a jury. Thus, the relative ability of any of the prospective jurors in the first sentencing proceeding to decide the proper sentence was of no moment, since those jurors did not ultimately decide the sentence.

## VI

Finally, although Thanos does not specifically raise the issue, we consider the trial court's imposition of the death

sentence under the Code, Art. 27, § 414(e). That section requires us to decide:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the ... court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the ... court's finding that the aggravating circumstances outweigh the mitigating circumstances.

■■■ We believe, first, that the trial court was not influenced by passion, prejudice, or any other arbitrary factor in sentencing Thanos to death. The trial and sentencing were removed from Baltimore County to Garrett County to ensure a neutral venue. In the first sentencing proceeding, the trial court cautiously declared a mistrial, fearing that the jury may have been tainted by improper testimony. In the second sentencing proceeding, the record reflects that the trial court dispassionately and rationally determined that the death penalty was appropriate.

■■■ Second, the evidence supports the trial court's finding of the statutory aggravating circumstance in § 413(d)(9), that the defendant "committed more than one offense of murder in the first degree arising out of the same incident." The record clearly establishes that Thanos murdered both Billy Winebrenner and Melody Pistorio. The evidence also supports the trial court's finding of the statutory aggravating circumstance in § 413(d)(10), that the "defendant committed the murder while committing ... a robbery." The record clearly establishes that Thanos committed the murders upon robbing the victims at the gas station.

■■■ Finally, the evidence supports the trial court's finding that the aggravating circumstances outweigh the mitigating ones. The record supports the court's finding that Thanos's taking of two lives—during the course of a rob-

bery—outweighed his impairment in conforming his conduct to the requirements of law.

The trial court's imposition of the death penalty was appropriate under the law.

*JUDGMENT AFFIRMED.*