632 A.2d 768

**John Frederick THANOS**

v.

**STATE of Maryland.**

**No. 91, Sept. Term, 1993.**

Court of Appeals of Maryland.

Per Curiam Order Oct. 27, 1993.

Opinion Nov. 10, 1993.

512

514

Michael R. Braudes, Asst. Public Defender, (Stephen E. Harris, Public Defender, on brief) Baltimore, for appellant.

Kathleen A. Behan (Arnold & Porter of Washington, DC, Susan Goering of Baltimore, Nevett Steele, Jr., Michael J. Gentile, Nevett Steele, Jr., P.A. of Towson, all on brief) for amicus curiae American Civil Liberties Union.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Mary Ellen Barbera and Gwynn X. Kinsey, Jr., Asst. Attys. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

## ORDER

PER CURIAM.

On September 27, 1993 the Circuit Court for Garrett County (Thayer, J.) issued a warrant of execution directing the Warden of the Maryland Penitentiary to execute John Thanos's death sentences during the week commencing Monday, November 1, 1993.

By an order dated October 5, 1993, the Circuit Court for Garrett County ordered that the warrant of execution be stayed until the termination of proceedings in the Court of Appeals of Maryland.

NOW THEREFORE, it is this 27th day of October, 1993

ORDERED, by the Court of Appeals of Maryland, that the stay entered by the Circuit Court for Garrett County on October 5, 1993 shall continue in force pending the determination of this case.

McAULIFFE, Judge.

John Frederick Thanos was convicted of first degree murder and sentenced to death in two separate cases, involving the murders of three persons. This Court affirmed the convictions and sentences in both cases. *See Thanos v. State*, 330 Md. 576, 625 A.2d 932 (1993) (murder of two teenagers on 3 September 1990; trial in Garrett County); *Thanos v. State*, 330 Md. 77, 622 A.2d 727 (1993) (murder of one teenager on 31 August 1990; trial in St. Mary's County). In the case with which we are here concerned, involving the murder of two teenagers and trial in Garrett County,[1] Thanos decided that he did not wish to file a petition for certiorari with the United States Supreme Court, or pursue post conviction or other collateral remedies in the state or federal courts.

By letter of 6 April 1993, one day after this Court affirmed his conviction in the St. Mary's County case, Thanos advised

---

1. The trial was removed to Garrett County from Baltimore County, where the murders took place.

the chief attorney of the appellate division of the Office of the Public Defender that he did not wish to pursue "any further litigation" and that he was terminating that office's representation of him. By letter dated 21 April, when his direct appeal in the Garrett County case was still pending before this Court, Thanos wrote to the Governor, complaining that the Office of the Public Defender insisted on filing additional motions on his behalf against his will, and stating, "I'll not appeal and as soon as the Court of Appeals reviews my case as is mandatory, you sign that death warrant." This Court affirmed the judgment and sentence in the Garrett County case on 7 June.

On 16 July, the State filed in the Garrett County case a "Motion for Hearing and Determination Regarding Waiver of Further Review Proceedings." The State pointed out that Thanos had by his letter to the Governor indicated a desire that no action be taken on his behalf after the completion of his mandatory direct appeal, and had therefore declined to file a petition for certiorari with the United States Supreme Court in the St. Mary's County case. The State further pointed out that Article 27, § 645A(a)(4) of the Maryland Code (1957, 1992 Repl.Vol.) provides that in a case in which a sentence of death has been imposed a warrant of execution shall be stayed for 240 days after final disposition of a writ of certiorari filed in the Supreme Court, or for 240 days after the expiration of the time for seeking review in that Court if no review is sought. The State contended that "the 240–day stay in Section 645A would not apply where a defendant knowingly and intelligently waives his right to post conviction review and to application of the statutory stay."

The State requested that the trial court conduct a hearing to advise Thanos fully of his rights and to determine whether he wished to waive any further rights and remedies, including his right to the statutory 240–day stay of execution. The State concluded that if the court should find that Thanos knowingly and intelligently waived those rights, the court should proceed to issue a warrant of execution. On 17 July, Thanos again wrote to the chief attorney in the appellate division of the Office of the Public Defender, confirming his

earlier request that the Public Defender terminate representation of him.

On 10 August, the trial court conducted a hearing on the State's motion. Although Mr. Thomas Saunders, Division Chief, Capital Defense Division, Office of the Public Defender, appeared on the defendant's behalf, the defendant insisted that he was representing himself. He asserted that he had discharged counsel, was competent to do so, and was competent to waive his right to further review as well. Mr. Saunders acknowledged Thanos's clear efforts to discharge him, but explained that he was appearing because, based on several conversations with mental health professionals who had evaluated the defendant, he feared that Mr. Thanos was not competent to waive his rights or discharge his attorneys. The court determined that a competency evaluation of the defendant was necessary before the court could rule on the validity of the waiver.

On September 27, 1993, the court received testimony from a psychiatrist and a forensic psychologist. Both professionals testified that in their opinions the defendant suffered from a mental disorder, but disagreed as to his competency. Dr. Hanson, the psychiatrist, opined that the defendant is able to waive counsel and understand the nature and object of the proceedings. Dr. Donner, on the other hand, felt that the defendant can appreciate the nature and object of the proceedings, but is unable to assist counsel, and therefore cannot effect a competent waiver of his rights to counsel or further review. The hearing judge, who had also presided at the defendant's trial in Garrett County, found that the defendant was "competent in both regards that were presented; that is, in his decision and desire to discharge his current counsel and to waive representation, and secondly, in his desire not to pursue any further legal review of his sentences."

The judge found that the 240–day stay "is a statutory right that may be waived or given up" by the defendant if he knowingly, intelligently, and voluntarily chose to do so. After detailed questioning of the defendant with respect to his

wishes and intentions, the court then found that "Mr. Thanos has knowingly, intelligently and voluntarily waived his right to the automatic stay under Section 645A . . . which is currently set to expire on May 5th, 1994,[2] and further, knowingly, intelligently and voluntarily waived his right to any further review of his sentences or convictions or both in this case." [3] The court then advised the defendant that should he change his mind, he could invoke the protection of the stay by filing a petition for post conviction relief or by withdrawing his waiver in writing, provided one of those documents was filed "well in advance of the date of your execution."

The instant appeal was filed in Thanos's name by the Office of the Public Defender (Public Defender). The appeal questions the competency finding, the propriety of having that decision made by the same trial judge who originally sentenced the defendant, and the propriety of obtaining any waiver prior to the expiration of the 240–day automatic stay. In response, the State has moved to dismiss the appeal based on lack of standing. The State asserts that because the Public Defender no longer represents the defendant, it has no standing to bring the appeal.

## I.

The questions of competency and standing are interrelated. If the trial court correctly determined that the defendant was competent to discharge the Public Defender and had knowingly and voluntarily done so, the Public Defender would have no standing to bring this appeal. On the other hand, if the defendant was not competent to make that decision, or the waiver of counsel was not voluntary and intelligent, the Public Defender would remain as the defendant's attorney and would

---

**2.** The court arrived at an expiration date of May 5, 1994 by determining that the stay began to run on September 7, 1993, the deadline for filing a petition for *certiorari* in the United States Supreme Court.

**3.** Although not explicitly stated, the court apparently found that Mr. Thanos had effected a competent waiver of his right to counsel *as well.*

have standing to bring the appeal. We turn, therefore, to the question of competency and waiver.

In each of Thanos's direct appeals to this Court, issues relating to his competency were before the Court. In the first of these cases, we said:

> [W]e think the record discloses that Thanos met the two-pronged test for competency to stand trial. He exhibited both "present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him."

*Thanos v. State, supra,* 330 Md. at 87, 622 A.2d 727 (quoting in part *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)). In the second case, we reviewed the entire record of proceedings and the expert testimony offered by the State and the defendant, and concluded that "Thanos understood the nature of the proceedings against him and was reasonably able to consult with his counsel...." *Thanos v. State, supra,* 330 Md. at 587, 625 A.2d 932.

In the case before us, the lower court's finding that Thanos was competent to make decisions concerning the discharge of his attorneys and the pursuit of additional legal proceedings was amply supported by the evidence. Although the experts who testified differed in their opinions, there was competent expert testimony supporting the conclusion reached by the court, upon which the court could and did rely. The test to be applied in a case such as this, set out by the Supreme Court in *Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966), is,

> whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

*See also Godinez v. Moran,* —— U.S. ——, —— - ——, 113 S.Ct. 2680, 2685–88, 125 L.Ed.2d 321 (1993) (competency standards same for standing trial and for waiver, even though

valid waiver may require additional finding that it was knowing and voluntary). We are satisfied that the trial judge applied the correct test, and that the record supports his decision that Thanos was competent to discharge his attorneys.

■ Similarly, the Public Defender's contention that the defendant was entitled to have the competency hearing conducted by a judge other than the judge who presided at trial must fail. Although a defendant has the right to have a post conviction proceeding considered by a judge other than the one who presided at trial, Maryland Rule 4–406(b), this hearing was not a post conviction proceeding within the meaning of that Rule. The hearing was initiated by a motion filed by the State, not the defendant, and did not involve a request for relief by the defendant. The only issues resolved were competency and waiver.

■ Nor do we find merit in the Public Defender's contention that the defendant should not have been permitted to discharge his counsel without first having been advised of the rights enumerated in Maryland Rule 4–215(a). That portion of the Rule deals with the advice of rights that is to be given before a pre-trial waiver of counsel is accepted; it has no application here.

■ We hold, therefore, that the trial judge did not err in his conduct of the hearing, or in finding that the defendant was competent to discharge the Public Defender as his attorney, and that the defendant did so knowingly, voluntarily, and intelligently. It follows that the Public Defender did not represent the defendant when he noted this appeal, and was without standing to do so. The defendant having discharged his attorney and having determined that no further appeal should be taken, the appeal must be dismissed. *See Cubbage v. State*, 304 Md. 237, 250, 498 A.2d 632 (1985) (where defendant has validly waived right of appeal, appeal must be dismissed).

## II.

■■■■■ Although ordinarily we do not express our views on questions raised by a dismissed appeal, on occasion we do so to resolve a matter of substantial importance. *Montgomery County v. McNeece,* 311 Md. 194, 200, 533 A.2d 671 (1987). This is such an occasion. The State contends, and the trial judge agreed, that the 240–day stay of execution of the death warrant mandated by Article 27, § 645A(a)(4) may be waived by the defendant. The Public Defender, and the American Civil Liberties Union of Maryland appearing as amicus curiae, contend that the statutory stay was intended by the legislature to be a definite control on the process as well as a right of the defendant, and cannot be waived by the defendant.[4] The question is one of statutory interpretation. It is an important question that has been fully briefed and argued here, and we elect to address it.

Article 27, § 645A(a) provides, in pertinent part:

(3)(i) Subject to the provisions of subparagraph (ii) of this paragraph, in a case in which a sentence of death has been imposed, the circuit court may not exercise jurisdiction over an initial proceeding under this subheading unless the petition for the initial proceeding is filed within 240 days after the date of:

1. An order denying a petition for a writ of certiorari by the Supreme Court of the United States;

2. A decision affirming the death sentence by the Supreme Court of the United States; or

---

**4.** The Public Defender and amicus also argue that even if waiver were possible, the defendant was not competent to waive the 240–day stay; that any waiver given was invalid because it was not a voluntary, intelligent, or knowing decision; and that the procedure was flawed. We have discussed these contentions in the context of the defendant's decision to discharge his attorney and waive the right to initiate further proceedings, and we have found them to be without merit. Our holding applies with equal force to the question of the defendant's purported waiver of the 240–day stay. If the stay could be waived by the defendant, we would find that the defendant was competent to waive it.

3. The expiration of the time for seeking review by the Supreme Court of the United States if no review is sought.

(ii) The circuit court may extend the period within which the petition for an initial proceeding shall be filed if good cause for the extension is shown.

(4) *Notwithstanding any other provision of law, a warrant of execution shall be stayed for 240 days after the date of:*

(i) An order denying any petition for a writ of certiorari by the Supreme Court of the United States;

(ii) A decision affirming the death sentence by the Supreme Court of the United States; or

(iii) The expiration of the time for seeking review by the Supreme Court of the United States if no review is sought.

(Emphasis added.)

 The proper starting point in the interpretation of any statute is with the plain language of the statute itself. *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). Where the language used is unambiguous, and consistent with the statute's apparent purpose, it should be accorded its ordinary meaning. *Ayres v. Townsend,* 324 Md. 666, 672, 598 A.2d 470 (1991). The specific language with which we are concerned is certainly clear, and is stated in mandatory terms: "notwithstanding any other provision of law, a warrant of execution shall be stayed for 240 days after [the applicable trigger date]."

When a legislative body commands that something be done, using words such as "shall" or "must," rather than "may" or "should," we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed.

*Tucker v. State,* 89 Md.App. 295, 298, 598 A.2d 479 (1991). *See also Jones v. State,* 310 Md. 569, 591–99, 530 A.2d 743 (1987) (defendant in capital case has no right to waive jury sentencing before guilt/innocence trial has begun; difficulty of refusing later withdrawal of waiver discussed); *State v. Brown,* 307 Md. 651, 657, 516 A.2d 965 (1986) (neither the

parties nor the court could "waive" requirement of statute and rule that defendant be tried within 180 days); *State v. Hicks,* 285 Md. 310, 318, 403 A.2d 356 (1979) (same). Thus, it is clear that the legislature intended this stay to be automatic and mandatory. A defendant need not take any action or file any request to activate the statutory stay. The sole unanswered question, or ambiguity, concerning the statute is whether the stay can be waived.

The State contends that the statutory stay is a personal right granted to the defendant to afford time to decide whether collateral proceedings should be undertaken, and if so, to permit proper investigation and preparation of a petition for post conviction relief. The Public Defender and amicus agree that the personal right of which the State speaks is certainly present, but they contend it is only one of two legislative intendments—the second is to carefully fix, regulate, and limit the difficult and socially sensitive process of State-ordered execution. This second component of the statute, they argue, is required for the integrity of the process and to satisfy the requirement of reasonable certainty imposed by a civilized society. Thus, they contend, the stay cannot be waived or altered by an individual defendant.

At one point in the development of the common law, it was the rule that an accused was not permitted to waive any rights intended for his protection. *Journigan v. State,* 223 Md. 405, 407, 164 A.2d 896 (1960), *cert. denied sub nom. Gardner v. Maryland,* 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 817 (1961). That rule has undergone considerable change, so that "[n]ow it is held generally that one accused of crime may waive almost every, if not every, constitutional right or privilege—among others a lawyer, a jury, confrontation of witnesses, and a speedy trial." *Id.* at 407–08, 164 A.2d 896. Accordingly, if the legislature intended by the imposition of this mandatory stay solely to provide a personal right to the defendant, waiver should be possible. The State concedes that there are statutory provisions regulating the death penalty process that are of general societal importance and cannot be waived by the defendant. Among those are the require-

**524**

ment of initial direct review by this Court of any case in which capital punishment has been imposed,[5] and the mandatory directions given the warden of the Maryland Penitentiary concerning the scheduling of the execution and the limited announcement of the day or hour of execution.[6] The State contends, however, that the mandatory 240–day stay does not fall into the same category.

We have considered the available legislative history, but find it to be of scant assistance in determining whether the General Assembly intended that the mandatory stay could be waived. The stay was enacted as a part of a comprehensive revision of the post conviction procedure statute, introduced as Senate Bill 497 in the 1991 Session of the Legislature. The bill was intended to expedite the trial and appeal process in capital punishment cases, and as originally drafted did not include the mandatory stay provision. A capsule summary of the progress of the bill may be found in a letter dated 26 March 1991 from George M. Lipman of the Office of the Public Defender to the Chairman of the House Judiciary Committee:

The Office of the Public Defender supports S.B. 497. As originally written, this Bill contemplated extensive changes in post conviction law, particularly regarding death penalty cases. This office vigorously opposed much of the original language as impractical and possibly unconstitutional. After much work by Senator Baker, the Attorney General, and our office, excellent legislation has passed the Senate.

This Bill mandates time frames for the filing of an initial death penalty post conviction petition and the Circuit Court hearing on that petition. Further the Bill requires a stay of execution pending the filing of the petition. Extensions of time frames are allowed for good cause shown.

\* \* \* \* \* \*

5. Maryland Code (1957, 1992 Repl. Vol., 1993 Cum.Supp.) Art. 27, § 414; Maryland Rule 8–306.

6. Maryland Code (1957, 1992 Repl. Vol.) Art. 27, § 75(e).

The reasonable time frames and stay provisions in this Bill would standardize practice, give the State a reasonable expectation of the date of filing, and allow the defense ample time to prepare thorough post conviction pleadings. The good cause language provides a fail safe.

The bill as originally introduced was primarily concerned with speeding up the processing of capital punishment cases. The amendments that were ultimately passed recognized the need for streamlining the process and imposing time limitations, but emphasized the need for deliberate speed as opposed to speed at any cost. The amendments also inserted into the process an automatic mandatory stay. Coupled with the limit of 240 days imposed for the filing of a post conviction petition, the bill as amended provided a mandatory stay of execution for the same period of time, thus fixing limits and protections that are known, definite, and automatic. We find no mention of the question of possible waiver of the stay anywhere in the legislative history.

Although the legislative history of the statute provides little guidance, we do find helpful the application of a familiar rule of statutory construction: that whenever possible an interpretation should be given to statutory language which will not produce an illogical or unreasonable result or lead to absurd consequences. *Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648 (1991); *Kaczorowski v. City of Baltimore, supra,* 309 Md. at 513, 525 A.2d 628; *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). We said in *Tucker* that where the words of a statute were susceptible of more than one meaning

the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Id.* at 75, 517 A.2d 730 (citations omitted).

Applying that test, we examine first the consequences that necessarily flow from the State's interpretation. The

State contends the defendant may waive the 240–day stay of execution. The State recognizes, however, as did the trial judge, that any such waiver cannot be irrevocable—that a defendant who changes his mind within the 240–day period must be permitted to file a petition for post conviction relief. As the Public Defender and Amicus point out, death row is an environment poorly suited to dispassionate decision making, and prisoners who have just been through an unsuccessful trial and sentencing proceeding may, and often do, announce decisions that they later recant. The suggestion that a defendant not be allowed to change his mind is unthinkable—the specter of a defendant being dragged into the gas chamber during the 240–day stay granted by the legislature, protesting that he had changed his mind but being told by the State that he must not go back on his word, is bizarre.

The trial judge recognized that a waiver could not be irrevocable. He ordered that the defendant should be permitted to withdraw his waiver, but only if he did so by filing a document "well before the scheduled week of execution so as to afford this Court sufficient time to stay the scheduled execution." The State and the warden also recognized that the defendant's waiver could not be made irrevocable. Moreover, they apparently recognize the difficulties inherent in interpreting and implementing the trial judge's order which would recognize as effective only a document filed "well before the scheduled week of execution...." Accordingly, the State filed in this Court an affidavit of the warden, stating that he had adopted the following policy:

1. At any time prior to execution, Thanos may assert a desire not to be executed and that assertion will be heeded by the Warden and his assistants.

2. At the time of the execution, while in the presence of the citizen witnesses, Thanos will be affirmatively asked whether he desires to halt the execution process. If he answers affirmatively, the process will halt.

3. Any physical conduct by Thanos that is inconsistent with voluntary acceptance of his death sentence including, but not limited to, resistance to being placed into the gas

chamber shall be interpreted as the assertion of a desire not to be executed and will halt the process.

The consequences of the trial judge's order and the warden's policy are so bizarre as to be unacceptable. In short, they have allowed the defendant to carry the keys to the gas chamber. A date and time will be set, tests will be run, witnesses gathered, without anyone, save possibly the defendant, knowing whether the execution will in fact proceed. The warden will have to keep a sharp lookout for any nonverbal conduct on the part of the defendant that may be inconsistent with voluntary acceptance of the execution, including any signs of resistance to being placed in the gas chamber. The warden will be placed in a difficult position of uncertainty, and burdened with the responsibility of decisions he should not have to make. The entire process becomes tentative, uncertain, and until the last moment subject to the control of the defendant. Such an uncertain and outlandish procedure is the antithesis of the precise, controlled process sought by the legislature in the 1991 enactment of Senate Bill 497. We have difficulty accepting the notion that the legislature intended, or would find acceptable, such a peculiar procedure.[7]

The interpretation advanced by the Public Defender and amicus produces no such uncertain or illogical results. If the defendant cannot waive the 240–day stay of execution, but does not desire to file a petition for post conviction relief, the trial judge will simply issue a death warrant for a time beyond the period of the stay, and there will be no uncertainty when that time arrives. The modest delay is one already considered and found acceptable by the legislature. The sole disadvantage to this approach is to the defendant who genuinely desires to advance the date of execution. Such wishes reasonably must be subordinated to the societal need for an orderly, directed, and certain procedure. We adopt the interpretation

---

7. The dissenting judges do not concede that this procedure would ever occur because they would hold that the defendant's waiver, once accepted, is irrevocable. We do not agree, and as we have noted above, neither the trial judge nor the State believed this position tenable.

that protects the integrity of the death penalty process without doing significant harm to the parties before us or to future death penalty litigants.

For the reasons earlier stated, this appeal must be dismissed. Having expressed our view that a defendant cannot waive the statutory 240–day stay of execution, we anticipate the trial judge will issue a new death warrant for a time beyond that period.

APPEAL DISMISSED, COSTS TO BE PAID BY BALTIMORE COUNTY.

Concurring and Dissenting Opinion by RODOWSKY, J., in which MURPHY, C.J. and KARWACKI, J., join.

RODOWSKY, Judge, concurring in part and dissenting in part.

I join in Part I of the opinion of the Court and in the mandate dismissing this appeal. I respectfully dissent, however, from the considered dicta in Part II where the Court, in my view, misconstrues Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 645A(a)(4). The construction that the automatic stay is unwaivable lacks support in the statutory language, is contrary to the ordinary rules of statutory construction, and does violence to the legislative history.

After Thanos had been found guilty of murdering sixteen-year-old Billy Winebrenner and fourteen-year-old Melody Pistorio, but before the death sentences for those murders were imposed, Thanos wrote the following letter, dated April 21, 1992, to Governor William Donald Schaefer:

"You said on the news tonight that something's wrong with this appeal process in these death penalty cases. I won't speak for others, but in my case I agree with you.

"My question is what are you going to do about it? I've got 3 attorneys who insist on filing motions and appeals for me after I've adamantly told them not to.

"I've written to their superiors and told them to withdraw all appeals and not file anymore. They've totally ignored

my letters. Duplicity runs deep in how my case is being handled. Great amounts of tax payers monies are being squandered.

"There is no question as to my guilt. I gave a lengthy video confession and I'm not sorry for anything—in fact I don't want to die, I'd rather seek revenge by killing the youthful, or elderly.

"So what are you going to do to stop these public defenders from squandering the public's money when I don't want them filing frivolous motions and appeals that I've neither wanted or requested.

"This is your chance to prove you're not a coward and all talk—I'll not appeal and as soon as the Court of Appeals reviews my case as is mandatory, you sign that death warrant."

After his convictions and sentences were affirmed on direct appeal, *Thanos v. State*, 330 Md. 576, 625 A.2d 932 (1993), Thanos, by letters to the trial judge and to public defenders, and in his testimony at the hearing below, adhered to the decision expressed in his letter to Governor Schaefer.

The majority today opines that the General Assembly intended that the 240 day automatic stay under § 645A must run its full course, *even under the circumstances here*, because the General Assembly intended to build into the capital sentencing process a guaranteed, minimum, 240 day delay in executing any death sentence. That reading of the statute is, in my opinion, plainly wrong.

The 240 day automatic stay under ¶ 4 complements the time limit set forth in ¶ 3 on the exercise by a circuit court of jurisdiction over an initial proceeding under the Post Conviction Act in a capital sentence case. A circuit court has no jurisdiction "unless the petition for the initial proceeding is filed within 240 days after the date of" certain events marking the end of direct review. § 645A(a)(3)(i). During that period execution of the death warrant is stayed to enable counsel and the person sentenced to death to prepare a petition seeking post conviction review. If a person under sentence of death

has determined not to seek post conviction review and has waived the benefit of the 240 day stay, the purpose of the automatic stay has been satisfied. The majority's construction divorces ¶ 4 from ¶ 3, and divorces ¶ 4 from its purpose, thereby violating the rule that a statute is to be construed in accordance with its purpose. *See Jones v. State,* 311 Md. 398, 535 A.2d 471 (1988).

The general rule is that rights or benefits conferred on an accused by constitutions, statutes, and rules of court may be waived. "[T]here are few, if any[,] instances where a criminal defendant is prohibited from surrendering his rights, be they constitutional or otherwise...." *State v. Magwood,* 290 Md. 615, 619 n. 2, 432 A.2d 446, 448 n. 2 (1981) (citation omitted). In recent years three cases have reached this Court in which persons convicted of crimes have contended that they enjoyed the kind of "super right," *i.e.,* unwaivable right, that the majority concludes is the nature of the 240 day automatic stay. In each case the contention was rejected.

The Court of Special Appeals in *McKay v. State,* 32 Md. App. 451, 362 A.2d 666 (1976), held that such a "super right" was created by Art. 21 of the Maryland Declaration of Rights, a holding that this Court promptly reversed. *State v. McKay,* 280 Md. 558, 375 A.2d 228 (1977). Article 21 provides in relevant part "[t]hat in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." McKay challenged the majority verdict by which he had been found guilty, while the State argued that McKay had waived the unanimity requirement. After tracing the history of the unanimity requirement through English and American legal history, the Court of Special Appeals concluded that Art. 21 "does not bestow a right but imposes a mandate." 32 Md. App. at 462, 362 A.2d at 674 (footnote omitted). That court concluded that "unanimity is an imperative requirement of a legal verdict in a Maryland criminal prosecution before a jury, and not a right of the accused which he may waive...." *Id.*

This Court stated the issue in *McKay* to be "whether unanimity, under the Maryland Constitution, is an imperative requirement that cannot be waived." 280 Md. at 566, 375 A.2d at 232. We pointed out that, by 1776, waivers of trial by jury and of a twelve member jury were permitted. *Id.* at 568, 375 A.2d at 233. Judge Levine, writing for a unanimous Court, then said:

"The contemporary era furnishes even less support for the 'imperative requirement' interpretation, particularly in light of the fact that other provisions in the Declaration of Rights protecting defendants in criminal cases, however fundamental they have been regarded by our society, are subject to waiver. Article 22, which declares that 'no man ought to be compelled to give evidence against himself in a criminal case,' may, 'like all other privileges,' be waived. *Allen v. State,* 183 Md. 603, 612, 39 A.2d 820 (1944). No less a right than trial by jury itself, as we have emphasized at length, could be waived well before independence. *State v. Zimmerman,* 261 Md. 11, 14–19, 273 A.2d 156 (1971). The poll of the jury, the very procedure by which unanimity is confirmed, is an 'absolute right' of 'constitutional dimension,' *Ross v. State,* 24 Md.App. 246, 253, 330 A.2d 507 (1975), *rev'd on other grounds,* 276 Md. 664, 350 A.2d 680 (1976), which can be waived by the simple failure to exercise it. Similarly, a mere failure to object to the admission of illegally seized evidence amounts to a waiver of that valuable right. *Jenkins v. State,* 232 Md. 529, 532–33, 194 A.2d 618 (1963); *Porter v. State,* 230 Md. 535, 536–37, 187 A.2d 870 (1963). Finally, the defendant can also waive the right to counsel, *State v. Blizzard,* 278 Md. 556, 575, 366 A.2d 1026 (1976); *State v. Fowler,* 259 Md. 95, 103–04, 267 A.2d 228 (1970); the right to confront the witnesses against him, *State v. Collins,* 265 Md. 70, 79–81, 288 A.2d 163 (1972); and the right to a speedy trial, *Bonner v. Director,* 237 Md. 445, 447, 206 A.2d 708 (1965). *See also Jones v. State,* 279 Md. 1, 6–16, 367 A.2d 1 (1976)."

280 Md. at 569–70, 375 A.2d at 234–35. This Court, in *McKay,* concluded:

"If, therefore, all these fundamental rights can be waived by the accused, there is no rationale for an interpretation denying him waiver of unanimity, which, like all the rights just enumerated, is generally regarded as existing primarily for his benefit."

*Id.* at 570, 375 A.2d at 235.

It is noteworthy that the benefit, to be waivable, need only be "primarily" for the defendant. Surely the unanimity requirement contains an element of benefit to society as a whole, by increasing the reliability of the finding that the accused is, in fact, the criminal agent, but that societal benefit does not block waiver by the person benefited. Similarly, any societal benefit that one under sentence of death have the opportunity to prepare to demonstrate that the conviction and sentence are open to collateral attack does not prevent waiver by the primary beneficiary of the provision for post conviction review.

In 1981, this Court decided *Logan v. State,* 289 Md. 460, 425 A.2d 632, by a four to three vote. Logan had voluntarily surrendered himself to the police after learning that a warrant of arrest, charging theft, was outstanding against him. *Id.* at 463–64, 425 A.2d at 634. Logan voluntarily signed a form, by the terms of which he waived his right to be taken promptly before a judicial officer. *Id.* at 475–76, 425 A.2d at 640–41. That right was then conferred by Maryland District Rule (M.D.R.) 723a, now Maryland Rule 4–212(f). One of the issues was whether M.D.R. 723 conferred rights on Logan which were his to waive, or whether the rule imposed nonwaivable duties upon police and judicial officers. *Id.* at 465, 425 A.2d at 635.

Earlier, *Johnson v. State,* 282 Md. 314, 322, 384 A.2d 709, 714 (1978), had stated that M.D.R. 723a was designed to bolster several fundamental constitutional guarantees, including the right to be informed of the accusation, freedom from unauthorized seizure of the person, the right to counsel or to have counsel appointed, and freedom from coercive investigatory methods. This Court said in *Logan* that it was "clear that each of the rights, constitutional or otherwise, contem-

plated by the rule to be made known to the accused at his initial appearance can itself be waived." 289 Md. at 469, 425 A.2d at 637. We said that "[i]t would be a strange holding indeed were we to conclude that though the defendant can knowingly waive a constitutional right, he cannot knowingly waive a court rule (absent specific language rendering such a purported waiver ineffective) adopted to bolster and implement that constitutional right." *Id.* at 470, 425 A.2d at 637.

We then addressed the contention that "the requirement of M.D.R. 723a imposes an independent obligation on the arresting officers, and that such a duty imposed by law upon another is not the defendant's to waive." *Id.* (footnote omitted). Rejecting that contention, we said:

"It is now well-settled by almost universal authority that when waiver is permitted, the potential beneficiary of the right surrenders both the privilege he possesses by virtue of it, as well as the ability to claim the advantage flowing from the failure to perform any corresponding obligation imposed on the State by that right. *See, e.g., Jones v. State,* 279 Md. 1, 7, 367 A.2d 1, 6 (1976), *cert. denied,* 431 U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977) (duty to bring defendant to trial imposed on State by defendant's right to speedy trial; right waivable); *State v. Renshaw,* 276 Md. 259, 270, 347 A.2d 219, 227 (1975) (right to counsel imposes duty on State to provide effective representation; right waivable); *State v. McKay, supra* (right to unanimous criminal jury verdict does not impose imperative requirement on the State to provide the same; right subject to waiver). The existence of that obligation seldom destroys the ability of the defendant to willingly forego what exists primarily for his benefit."

*Id.* at 470–71, 425 A.2d at 637–38.

The dissenting judges in *Logan* accepted the analysis "that the obligation of the police, under subsection a of the rule, to take an arrestee before a judicial officer 'without unnecessary delay,' has the effect of conferring upon the arrested defendant a *right* to prompt presentment." *Id.* at 491, 425 A.2d at

648 (Eldridge, J., dissenting). The dissenting judges in *Logan* likewise accepted the proposition that the right to a prompt initial hearing was subject to a knowing and intelligent waiver. *Id.* The disagreement with the majority had to do with whether the particular waiver executed by Logan was effective. *See id.* at 491–99, 425 A.2d at 648–52 (Eldridge, J., dissenting).

In the case now before us there is no disagreement concerning Thanos's competence to discharge counsel and to forego collateral review. Yet, contrary to *Logan,* the majority today concludes that the obligation on the State to defer execution exists independently of whether Thanos has waived his correlative right to collateral review.

The third "super right" case is *Cubbage v. State,* 304 Md. 237, 498 A.2d 632 (1985). There, the accused, as part of a plea bargain, had waived appeal, but, after sentencing, nevertheless appealed. *Id.* at 238–39, 498 A.2d at 639. Cubbage submitted that any waiver of the right of appeal is contrary to public policy and ineffective. *Id.* at 240, 498 A.2d at 634. After determining that Cubbage voluntarily had waived his right to appeal, we held that the appeal going to the merits of the judgment of conviction should be dismissed. *Id.* at 250, 498 A.2d at 639. Citing, *inter alia, Logan* and *McKay,* we observed that Cubbage's argument dealt "simply with another specific application of the general concept that nearly every right, constitutional or statutory, may be waived." *Id.* at 241, 498 A.2d at 634.

Against the background of these cases, one would expect a bill intended by the General Assembly to create just such a "super right" to do so in clear and unambiguous terms. This is particularly true when one considers that the General Assembly has already created a nonwaivable direct review of death sentences under Art. 27, § 414 which necessarily encompasses an appellate review of the guilty verdict. The direct review mandated by § 414 can be accomplished by review of the record without the participation of the person under sentence of death. In contrast, the automatic stay under

§ 645A(a)(4) is tied to the initial petition for post conviction review, which almost always requires the cooperation of the prisoner. Nothing in the language of § 645A(a) suggests that the General Assembly intended that, in addition to the automatic direct review, the stay should run its full course even when the prisoner has waived post conviction review.

For the textual support for its conclusion, the majority relies on the introductory language of § 645A(a)(4), "[n]otwithstanding any other provision of law." The quoted language makes the 240 day stay arise automatically. The function of the quoted language is to override other provisions of law concerning stays of execution of a death warrant. The quoted language should not be extended to include, and to repeal, the law of waiver.

Under the Maryland Rules of Procedure and absent the "[n]otwithstanding" introduction, an application to a circuit court to stay execution of a death sentence would be by motion in writing, setting forth the grounds upon which it is made and the relief sought. Md. Rule 4–252(c) and (d). A copy would be served on the State. Md. Rule 1–321(a). The State would have fifteen days within which to respond. Md. Rule 4–252(e). The circuit court would have to sign an order and that order would have to be filed with the clerk and entered on the docket. Further, the circuit court would not be stripped, under all circumstances, of any discretion whatsoever in acting on the merits of the request, and the circuit court certainly would have discretion as to the length of the stay. Depending on how that discretion might have been exercised in any given case, one or more applications, additional to the original stay request, might be made within the first 240 days following exhaustion of direct review in a capital sentence case. The "notwithstanding" language creates the stay without the need for pursuing these procedural steps.

Under the majority's construction, the "[n]otwithstanding" language of ¶ 4 sweeps far beyond an override of the procedural steps necessary to obtain a stay. Under the majority's view, the general law of waiver cannot be applied, even if

there is an express waiver by a competent beneficiary of the stay. That is so extraordinary a conclusion that an intent to create that result should not be attributed to the General Assembly, unless clearly expressed in the statute.

Prohibiting waiver of the stay created by § 645A(a)(4) where post conviction review has been waived simply creates delay for no purpose. That result collides with the insuperable hurdle of the legislative history. Paragraphs 3 and 4 of § 645A(a) were enacted by Chapter 499 of the Acts of 1991. The aim of that legislation is to reduce unnecessary delay in the carrying out of death sentences. Chapter 499 was Senate Bill 497, introduced by the Chairman of the Senate Judicial Proceedings Committee.

Senate Bill 497 was concerned with the number of different judicial proceedings potentially available to a condemned murderer after direct review of the conviction and death sentence had been exhausted. These begin with a petition for post conviction review filed in a Maryland circuit court. There may be an appeal, allowable in the discretion of this Court, from the post conviction court's judgment, and there may be a further, discretionary review by the United States Supreme Court of post conviction issues. A flow chart contained in the legislative file on Senate Bill 497 pointed out that the convicted murderer may twice petition for proceedings under the Maryland Post Conviction Act. Assuming no court reverses or remands in whole or in part as a result of proceedings under the Maryland Post Conviction Act, the condemned murderer may then petition the United States District Court for the District of Maryland for habeas corpus relief. If that relief is denied, the condemned murderer may appeal to the United States Court of Appeals for the Fourth Circuit. From that court's determination, if adverse, the condemned murderer may seek discretionary review by the United States Supreme Court. The same flow chart also stated that there is no limit on the number of times a prisoner may petition for federal habeas corpus relief. If no court engaged in federal habeas corpus review reverses or remands in whole or in part, then the condemned murderer may petition a Maryland circuit

court alleging that the petitioner, in the interim, has become incompetent and may not be executed. The flow chart advised that a determination adverse to the petitioner in that proceeding would be subject to discretionary review by this Court. This Court's determination, according to the flow chart, could be the basis for again invoking federal habeas corpus review.

Senate Bill 497 also had its genesis, as reflected by the legislative file, in an unsigned legal memorandum or workpaper, headed, "Suggestions for Reducing Delay in Capital Litigation." That memorandum made twelve specific suggestions that were within the control of state law. Suggestion No. 7 addressed post conviction review in state courts and reads:

"7. **Adopt 180 day filing deadline for post-conviction petition in capital cases.**

"Explanation: Even one day of delay in a capital case is a victory for the defense. Delay is a strategy. Without a deadline on the filing of a post-conviction petition, however, the only way to see a death sentence challenged on post-conviction is to go through the charade of obtaining a warrant of execution (as if anyone is going to be executed without even one post-conviction). Under the current system, no one even starts looking for an attorney for the condemned prisoner until the Supreme Court denies cert.— a minimum of 4 months after the Court of Appeals' affirmance. And then, once an attorney is found, that attorney wants at least 6 months to prepare the post-conviction decision. The trade off here is time for a more formalized system of obtaining representation in capital post-conviction cases.

"Suggested legislation:

"See amendment post conviction statute, attached."

The attachment to the memorandum proposed amending the post conviction statute to provide, *inter alia,* an additional ¶ 3 to § 645A(a) reading as follows:

"(3) In a case in which the death penalty has been imposed, the circuit court may not exercise jurisdiction over

a proceeding under this subtitle unless the initial petition is filed:

(i) Within 180 days of an order denying any petition for writ of certiorari or a decision affirming the death sentence; or

(ii) Within 90 days of the expiration of the time for seeking review by the Supreme Court if no review is sought."

These materials were furnished to the Department of Legislative Services where a bill was drafted. The "request form" of the Department of Legislative Services, used to cover transmittal of the draft through an internal review process, describes the substance of the legislation as "expediting capital cases." Senate Bill 497, as introduced, contained ¶ 3 in the form identical to that proposed in conjunction with the legal workpaper.

The bill was referred to the Senate Judicial Proceedings Committee where five amendments were placed on the bill and, as so amended, the bill was favorably reported. The third of these amendments changed ¶ 3 substantially to the form in which it was enacted, and added ¶ 4 in exactly the form in which it was enacted.

The bill was presented to the full Senate accompanied by a floor report from the committee in which amendment No. 3 was described as follows:

"This amendment adds language that establishes the 240 day time period within which an initial post conviction petition must be filed in a death penalty case. It also adds language that requires that a warrant of execution be stayed during this time period."

Under the heading, "BACKGROUND," the floor report also advised in relevant part:

"There is currently no statute of limitations for the filing of a post-conviction petition. Nor is there currently a specific time period within which a court must hold a hearing on a post conviction petition. The purpose of this bill is to

establish a type of statute of limitations for the first petition in a death penalty case....

"*This bill is intended to prohibit unnecessary delay in the filing of post conviction petitions in death penalty cases* and in the scheduling of hearings in such cases. According to testimony, the State must currently resort to a warrant of execution if the State wants to motivate a defendant who has been sentenced to death to file a post conviction petition. This bill will require the initial post conviction petition in a death penalty case to be filed within the specified period regardless of whether the State has obtained a warrant of execution."

(Emphasis added). The bill passed the Senate by a vote of forty yeas to one nay, with six senators not voting.

In the House of Delegates, Senate Bill 497 was referred to the Judiciary Committee, to whose chairman the Office of the Public Defender wrote in support of the bill. That letter described the bill as "excellent legislation" and the product of "much work" by the Chairman of Judicial Proceedings, the Attorney General, and the Office of the Public Defender.

The interrelation between ¶¶ 3 and 4 of § 645A(a) is made clear by the public defender's explanation:

"This Bill mandates time frames for the filing of an initial death penalty post conviction petition and the Circuit Court hearing on that petition. Further the Bill requires a stay of execution *pending the filing of the petition.* Extensions of time frames are allowed for good cause shown.

"This Bill does more than satisfy concerns regarding delays in death penalty litigation. Under present law a prosecutor may seek an execution date immediately upon the Supreme Court's final action on direct appeal. If the prosecutor so pushes for a quick execution date, the Public Defender must quickly appoint counsel to prepare a hasty post conviction petition with the hopes of subsequent amendment and possibly a reassignment of counsel. This practice is wasteful and may jeopardize a clear presentation of the defendant's claims.

"The reasonable time frames and stay provisions in this Bill would standardize practice, give the State a reasonable expectation of the date of filing, and allow the defense *ample time to prepare thorough post conviction pleadings.* The good cause language provides a fail safe."

(Emphasis added). The bill passed the House 120 to 3, and the Senate concurred in the House amendments forty-six to nothing.

I believe that the members of the General Assembly who voted so overwhelmingly to eliminate unnecessary delay in capital cases will be shocked at an interpretation declaring that they voted to delay for the sake of delay, when post conviction review has been waived. This Court, construing statutes establishing punishments for crimes in order to determine the unit of prosecution, has said that "in addition to considering the specific words of the statute, we may consider the general history and prevailing mood of the legislative body with respect to the type of criminal conduct involved." *Randall Book Corp. v. State,* 316 Md. 315, 327, 558 A.2d 715, 721 (1989). In *Randall Book Corp.* we rejected applying a rule of lenity in prosecutions for knowingly displaying obscene materials for advertising purposes. *Id.* at 327–28, 558 A.2d at 721–22. Similarly, in *Cunningham v. State,* 318 Md. 182, 188, 567 A.2d 126, 129 (1989), we rejected a construction based on the rule of lenity in determining the unit of prosecution for possession of controlled dangerous substances where the defendant simultaneously possessed two different controlled dangerous substances. We expressed our belief that "the prevailing mood of the Maryland General Assembly with respect to illegal drug activity" is " 'to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter.' " *Id.* at 189, 567 A.2d at 129. My reading of the legislative history of Senate Bill 497 reveals no intent to treat murderers under death sentence more leniently than purveyors of drugs or pornography.

The majority nevertheless concludes that a nonwaivable stay, as contrasted with an irrevocable waiver of the stay or with some kind of waiver revocable at the option of the

prisoner, is the only construction of § 645A(a)(4) that does not produce an absurd result. I agree with the majority that the General Assembly never intended for the prisoner to be able to renounce a waiver, after a court has determined competence to discharge counsel and to waive further review. The majority bases its rejection of irrevocable waiver, however, on "the specter of a defendant being dragged into the gas chamber during the 240–day stay granted by the legislature, protesting that he had changed his mind but being told by the State that he must not go back on his word...." 332 Md. 511, 526, 632 A.2d 768, 775 (1993).

Given that the current public policy of this State, as manifested in its law, recognizes the death penalty, the majority's rejection of the irrevocable waiver alternative is unfocused. While perhaps appropriate to a general social policy debate on the death penalty, *vel non*, the majority's specter adds nothing to the analysis of why the stay must be unwaivable. A similar specter could be envisioned in which a condemned murderer seeks to revoke a waiver of the right to remain silent and, at the last moment, to withdraw a confession. Waiver certainly would apply in the latter instance, and there is nothing peculiar about the 240 day stay that alters the waiver result if conventional jurisprudence, uniformly applied, is the controlling standard for adjudication.

Further, a construction of § 645A(a)(4) that makes the waiver irrevocable does not, as the majority implies, immediately terminate all possible further review. The prisoner simply moves to the next step depicted on the flow chart. Federal habeas corpus review remains available with respect to federal constitutional issues that the prisoner had raised before the State's highest court, even if no state post conviction proceeding has been brought. *Castille v. Peoples,* 489 U.S. 346, 350, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380, 386 (1989); *Humphrey v. Cady,* 405 U.S. 504, 517 n. 18, 92 S.Ct. 1048, 1056 n. 18, 31 L.Ed.2d 394, 407 n. 18 (1972). In addition, applications for executive clemency remain available, particularly for cases presenting meritorious grounds based on newly discovered evidence.

Were the irrevocable waiver construction advanced in this dissenting opinion to be applied in the case at hand, Thanos, however, would have an additional procedural option if he were to change his mind. If, prior to his scheduled execution but within the 240 day period, Thanos were to petition for post conviction review, the issue of whether his particular waiver was effective in the first instance would be presented. Thanos could submit that his waiver was not knowing, in view of the erroneous advice given to him by the circuit court and confirmed by the affidavit of the Commissioner of Correction, that Thanos's waiver was revocable at his option.

MURPHY, C.J., and KARWACKI, J., have authorized me to state that they join in the views expressed in this concurring and dissenting opinion.